FAW, CASSON & CO., a Partnership,
Plaintiff,

v.

Frank W. CRANSTON, Defendant.

Court of Chancery of Delaware,
Kent County.

Submitted April 4, 1977.

Decided June 14, 1977.

William H. Vaughn, Vaughn & Vaughn, Dover, for plaintiff.

John S. Grady, Bader, Dorsey & Kreshtool, Dover, for defendant.

MARVEL, Chancellor.

This is an action for injunctive relief against a former employee in the form of a permanent injunction against such employee's alleged violation of a covenant not to compete with plaintiff prior to December 1, 1978 (such covenant being allegedly contained in defendant's employment contract), as well as for damages. This is the opinion of the Court after final hearing.

Faw, Casson & Co. is a public accounting firm having offices in Dover, Salisbury, Easton and Ocean City, all on the Delmarva peninsula. The defendant is a certified public accountant who was first employed by plaintiff as a staff accountant in November of 1971. In the latter part of November, 1975 defendant was offered a promotion from staff accountant to manager of plaintiff's office in Dover, a position of greater authority involving the organization of accounting work and the supervision of staff accountants. Defendant was informed that if he were to accept the promotion to manager, he would receive a salary increase of $2,000 per annum and would be required to sign an agreement not to compete against plaintiff in the business of accounting prior to December 1, 1978.

The defendant began to work in his new position as manager for the plaintiff on or about December 1, 1975, however, he did not sign the agreement not to compete until the end of January, 1976, at which time the agreement was back dated to December 1, 1975. During the interim discussions apparently took place between the parties concerning the force and effect of the agreement not to compete after December, it being contended by defendant that he was told by Raymond D. Falconetti, a partner in the plaintiff firm, and who had reported the terms of his promotion to defendant, that the agreement was not enforceable.

Defendant left the employment of the plaintiff in October of 1976 when he resigned to open his own public accounting office in Dover, Delaware. Subsequently, a number of plaintiff's clients, who had been accustomed to consulting defendant for the most part as to their accounting problems, ceased doing business with the plaintiff and transferred their accounts from plaintiff to the defendant, resulting in the present litigation.

The agreement between the parties, which contains defendant's alleged covenant not to compete, takes the form of a letter addressed to the defendant and signed by Mr. Falconetti on behalf of the plaintiff. The text of the letter provides in its entirety:

> "The Firm is pleased that you have accepted the position of Manager and we are proud to recognize your accomplishment.

> "In discussing this position with you, we stated that the partnership would like to have an agreement from you stating you would refrain from practicing public accounting on the Delmarva Peninsula other than with Faw, Casson & Co. until December 1, 1978. Your signature on this letter will confirm our agreement."

Following the signature of Mr. Falconetti is a line to the effect that . . . " * * The above terms are agreeable * * * ",

followed by a space for the signature of Mr. Cranston, which thereafter was affixed.

Plaintiff contends that the agreement of the defendant not to compete is an enforceable contractual provision, the breach of which entitles it to injunctive relief. Defendant's opposition to such contention is based on four basic arguments, made in the alternative, (1) that the letter in question does not constitute a binding contract; (2) that the agreement contained therein is unenforceable because of a failure of consideration; (3) that the agreement is unreasonable, and (4) that the plaintiff is estopped from enforcing the agreement.

In support of his first contention, namely, that the agreement does not constitute a binding contract, defendant emphasizes the fact that the letter states that the partnership informed the defendant that it " *  * would like  *  *  * " a non competition agreement and that defendant merely indicated that he was "agreeable" to the proposed terms. He argues that the term "would like" is vague and imprecise and that "agreeable" does not imply consent.[1] Defendant also argues that the agreement is vague as to details.

■■■ In general, an agreement by an employee not to follow his trade or business for a limited time and in a limited geographical area is not void as against public policy when the purpose of such agreement and its reasonable effect is to protect an employer from sustaining damages which an employee's subsequent competition may cause, *Capital Bakers, Inc. v. Leahy*, 20 Del.Ch. 407, 178 A. 648, 649 (1935). See also, Restatement of the Law of Contracts, Sec. 516(f) (1932). However, such covenants are subject to somewhat greater scrutiny when contained in an employment contract as opposed to contracts for the sale of a business, *Original Vincent and Joseph, Inc. v. Schiavone*, 36 Del.Ch. 548, 134 A.2d 843, 845 (1957).

---

1. Defendant cites Webster's New Collegiate Dictionary for the following definition of "agreeable": "1. Pleasing to the mind and senses esp. as according well with one's tastes or needs; 2. ready or willing to agree or consent; 3. being in harmony."

The formal elements required in an agreement not to compete are the same as those required for a contract in general, namely a mutual assent to the terms of the agreement by all parties and the existence of consideration, Restatement Law of Contracts, Sec. 19 (1932). In the present case, defendant's first argument relating to the words "would like" and "agreeable" concentrates on the question of mutual assent, the argument being that the use of the phrases above noted allegedly indicated that the parties did not intend that a binding contractual commitment was to be made.

However, the term "agreeable" in the phrase " * * * the above terms are agreeable * * * " must be read in light of the last sentence contained in the body of the letter in question, which provides that " * * * Your signature on this letter will confirm our agreement. * * * "

I conclude that defendant's act of signing the letter provided written confirmation of his agreement not to compete with the defendant for the period specified. Any other conclusion would directly contradict the two sentences which precede his signature. The making of fine distinctions between various meanings of the terms "agreeable" and "consent" fails to obscure the clear expression of assent which this document contains.

Similarly, the fact that the letter stated that the plaintiff " * * * would like * * * " to have the agreement in question rather than a more assertive expression is not dispositive of the question of whether or not defendant's promotion was conditional upon the execution of such an agreement. Terms of an offer courteously expressed may nonetheless compel a finding that a contract exists. I also conclude that the letter is not ambiguous, the letter making reference to an agreement by defendant that he " * * * would refrain from practicing public accounting on the Delmarva Peninsula other than with Faw, Casson & Co. until December 1, 1978 * * * ". Thus, such terms are specific as to location, the nature of the restriction and the duration of the covenant not to compete.

Although agreements not to compete must be closely scrutinized as restrictive of trade, they are equally subject to the rule that inferences arising out of parts of an instrument will not be allowed to control the interpretation of an instrument as a whole where such inferences negative the intent of the scheme dealt with as a whole, *Stemerman v. Ackerman*, 40 Del.Ch. 431, 184 A.2d 28 (1962). Defendant's argument that the letter in issue is ambiguous and does not represent a manifestation of mutual assent to definite terms is not persuasive.

Plaintiff's second argument namely that the agreement is unenforceable because of a failure of consideration is largely based upon the fact that the defendant began work as a manager on or about December 1, 1975, or about two months before he signed the letter agreement. Defendant urges that contracts not to compete entered into by an employee after he has already commenced work with an employer are not supported by consideration, citing *James C. Greene Co. v. Kelley*, 261 N.C. 166, 134 S.E.2d 166 (1964) in which it was stated that:

> "It is generally agreed that mutual promises of employer and employee furnish valuable considerations each to the other for the contract. However, when the relationship of employer and employee is already established without a restrictive covenant, any agreement thereafter not to compete must be in the nature of a new contract based upon a new consideration. Therefore, the employer could not call for a covenant not to compete without compensating for it."

See also *Morgan Lumber Sales Co. v. Toth*, Ohio Com.Pl., 41 Ohio Misc. 17, 321 N.E.2d 907 (1974); *Mastrom, Inc. v. Warren*, 18 N.C.App. 199, 196 S.E.2d 528 (1973) and *Capital Bakers, Inc. v. Townsend*, 426 Pa. 188, 231 A.2d 292 (1967).

There also exists, however, a corollary to the principle enunciated in the cases upon which defendant relies, namely that a beneficial change in an employee's status may constitute sufficient consideration to support a restrictive covenant agreed to

after the initial taking of employment. See *M. S. Jacobs and Associates, Inc. v. Duffley*, 452 Pa. 143, 303 A.2d 921 (1973), citing *Jacobson & Co. v. International Environment Corp.*, 427 Pa. 439, 235 A.2d 612 (1967), a situation, which, it would appear, exists here.

■ Thus, it is clear that all of the terms of defendant's promotion were set forth fully at the time it was offered to him and the need for an agreement not to compete was not an afterthought sought to be imposed after the original proposal. Secondly, although the defendant began serving in the position of manager prior to the time when he signed the agreement not to compete, there is no evidence of a waiver on the part of the plaintiff of its right to a non competition agreement as a condition precedent to promotion. Indeed, the plaintiff remained free to decline to accept such promotion. Moreover, there is evidence in the record of discussions between the plaintiff and defendant during the interim between the time when defendant began serving as manager and when he signed the letter of such a nature as to bring to defendant's attention that acceptance of the agreement was a prerequisite to permanent retention of the position of manager.[2] I therefore conclude that the agreement not to compete was an integral part of the overall promotion agreement and an element of consideration tendered by the defendant in exchange for his promotion to the position as manager and that a failure of consideration did not occur in the present case.

■ The third argument made by defendant is that the agreement is unenforceable in that any restraint of trade is generally held to be unreasonable if (a) it is greater than is required for the protection for which the restraint is imposed, or (b) it imposes undue hardship upon the restricted person, see Restatement of Contracts, Sec. 515 (1932), the modern rule being that a restrictive covenant should be enforced only to the extent that it is reasonable so to do, *Knowles-Zeswitz Music, Inc. v. Cara*, Del. Ch., 260 A.2d 171 (1969).

■ Defendant argues that the covenant not to compete here in issue is excessively broad in that it restricts plaintiff from accepting rather than from actively soliciting former clients. However, I find such distinction to be without merit, one of the purposes of such a covenant being to protect the employer from loss of business arising out of an employee's profitable association with the former's employer's clientele. Damages of this type occur as well whether an employer's clients are solicited or merely accepted by a former employee.

■ Defendant also argues that as a matter of public policy a restrictive covenant should be held per se unreasonable when applied to certified public accountants. On this point, defendant relies upon the New Jersey opinion of *Dwyer v. Jung*, 133 N.J.Super. 343 (Ch.Div.), 336 A.2d 498, aff'd, 137 N.J.Super. 135, 348 A.2d 208 (1975), in which the covenant involved had to do with the restricting of competition between former members of a law firm for a period of five years following such firm's dissolution. Such restrictive covenant was held to be void as against public policy. Defendant argues that this conclusion should be extended to similar covenants involving accountants.

While the opinion in *Dwyer v. Jung*, supra, speaks in general terms, the decision appears to be predicated on the provisions of DR2–108(A) of the Disciplinary Rules of

---

**2.** The following dialogue occurred at trial during the examination of Raymond Falconetti:

The Court: " * * * He was made manager. But the point is, did he understand that position was to be conditioned at least for any permanent basis on entering into the agreement?

The Witness: "Yes, he did. He understood as I guess indicated in his deposition that the agreement that was given to him at the end of December was an agreement with the terms that was discussed with him in early December" (Transcript, p. 104).

Indeed, defendant's own testimony confirms Falconetti's insistence that the agreement be signed since he stated that Falconetti directed him that "You have got to sign it." (Transcript, p. 63).

the Code of Professional Responsibility of the American Bar Association which expressly prohibits agreements between lawyers which restrict the right of a lawyer to practice law after the termination of an employment relationship. Moreover, the basis for the decision is, if anything, strengthened by the opinion on appeal of the Appellate Division in which it is clearly stated:

> "Substantially for the reasons set forth in Judge Kimmelmon's opinion . . . , we hold that this covenant violates DR2–108(a) of the Disciplinary Rules adopted by our Supreme Court and is unenforceable."

137 N.J.Super. 135, 348 A.2d at 208 (1975).

A provision similar to DR2–108(A) of the New Jersey Supreme Court disciplinary rules has been adopted by the Delaware Supreme Court. See The Delaware Lawyer's Code of Professional Responsibility, DR2–108(A) (1974). However, no comparable provision regulates the conduct of accountants.[3] Indeed, testimony was adduced at trial to the effect that a substantial number of accounting firms utilize agreements such as the one in issue here and that such agreements are not considered to be unethical in the accounting profession.

Furthermore, several cases have upheld and enforced agreements not to compete when concerned with accountants. See *Ebbeskotte v. Tyler,* 127 Ind.App. 433, 142 N.E.2d 905 (1957), *Scott v. Gillis,* 197 N.C. 223, 148 S.E. 315 (1929), and *Racine v. Bender,* 141 Wash. 606, 252 P. 115 (1927). Each of these decisions recognizes that an accounting firm has a substantial interest in protecting its business from former employees who have gained knowledge of its clients and internal operations and who thereafter engaged in a competing practice. The policy underlying such decisions is well stated in the case of *Ebbeskotte v. Tyler,* supra, as follows:

> "Courts scrutinize carefully all contracts limiting a man's natural right to follow any trade or profession anywhere

he pleases and in any lawful manner. But it is just as important to protect the enjoyment of an establishment in trade or profession, which its possessor has built up by his own honest application to every day duty and the faithful performance of the tasks which every day imposes upon the ordinary man. What one creates by his own labor is his. Public policy does not intend that another than the producer shall reap the fruits of labor. Rather it gives to him who labors the right by every legitimate means to protect the fruits of his labor and secure the enjoyment of them to himself. 'Freedom to contract must not be unreasonably abridged. Neither must the right to protect by reasonable restrictions that which a man by industry, skill, and good judgment was built up, be denied.' "

142 N.E.2d at 910. See also *Granger v. Craven,* 159 Minn. 296, 199 N.W. 10 (1924).

■ Defendant next argues that the geographic area encompassed by the covenant in question, namely the Delmarva peninsula, is unreasonably broad. As noted above, the plaintiff firm maintains offices in Easton, Salisbury and Ocean City, Maryland, and in Dover, Delaware. Thus, such offices are well dispersed throughout the peninsula, which contains virtually all of Delaware and the eastern shores of Maryland and Virginia rather than being concentrated in a section of such area. It may be assumed, therefore, that the plaintiff firm possesses the capability to serve clients throughout the area which is the subject matter of the agreement, and defendant has failed to prove that enforcement of the agreement on the Delmarva Peninsula would be an unreasonable restraint of trade in light of the nature of the business here involved.

■ However, determination of just where the northern border of the area to be protected lies is not without difficulty since the point at which a peninsula begins and ends is unclear. In this case I conclude that the agreement not to compete should

**3.** The accounting profession and numerous other professions and occupations are regulated by statute in Delaware. See 24 Del.C. Sec. 101 et seq. (1974).

not be enforced so as to prohibit business activities of the defendant in competition with plaintiff taking place north of the Chesapeake and Delaware Canal, such division line representing a practical division line between northern Delaware and the Delmarva peninsula.

█ Finally, on the question of estoppel, defendant persists in contending that he signed the agreement on the assumption upon Mr. Falconetti's alleged statement that the agreement was unenforceable would be honored. However, Mr. Falconetti's testimony contradicts that of the defendant, his recollection of the conversation being that he stated that it was hoped that the agreement would never have to be enforced[4], and that he didn't say that the agreement was unenforceable.[5]

In accepting Mr. Falconetti's testimony as more credible, it is noted that defendant's testimony at trial contradicted his pre-trial deposition on at least one significant issue noted in the footnote below and is therefore deemed to be less than fully reliable.[6] Plaintiff is not estopped from enforcing the agreement.

Plaintiff's prayer for an order enjoining defendant from practicing public accounting on the Delmarva Peninsula, as above defined, in competition with plaintiff until December 1, 1978 will be granted and the case set down for a hearing on the extent of plaintiff's damages.

An appropriate form of order may be submitted on notice.

4. Transcript, p. 25.

5. Transcript, p. 102.

6. The following examination of the defendant took place at trial concerning the time at which the defendant learned of the substance of the noncompetition agreement:
"A He mentioned there was going to be an agreement, and then he showed it to me in late December of 1975.
"THE COURT: When did he first mention it to you; before December, or in the month of December?
"THE WITNESS: I believe it was the month of December. Right about the first part of December, when it was mentioned. He said there would be an agreement, *and that was the extent of it. And then he produced the agreement late December of 1975.*

"BY MR. GRADY:
"Q When was the first time you had any discussion of any substance about the agreement?
"A *Late December and January.*"
Transcript, p. 61 (emphasis added).
Defendant's deposition testimony was later read into the record at trial and directly contradicts the above.
"Question: On what date were you told the intended content of the agreement?
"Answer: Right around the first week in December.
"Question: Did the agreement conform to what you were told it would be?
"Answer: Yes."